**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 13 |
| | ) | |
| JONATHAN P. QUINN, | ) | Case No. 07-11290 (BLS) |
| CHRISTINA E. QUINN, | ) | |
| | ) | |
| | ) | Docket Reference Nos. 63, 74, |
| _____ Debtors. | ) | and 97 |

<u>**OPINION**</u>[1]

Before the Court is a motion by Ciappa Construction, Inc.
and Michael Ciappa (together, "Ciappa") to dismiss the Chapter 13
proceeding of Jonathan P. Quinn and Christina E. Quinn (the
"Quinns") [Docket No. 74].  In the alternative, Ciappa requests
leave from this Court to amend its claim as to the Quinns'
bankruptcy proceeding [Docket No. 63].  In addition, the Quinns
request approval to modify their Chapter 13 bankruptcy plan
[Docket No. 97].  For the reasons set forth below, the Court will
deny Ciappa's motion to dismiss, grant Ciappa leave to amend its
claim, and grant the Quinns' request to modify their Chapter 13
bankruptcy plan.

---

[1]   This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Federal Rule of
Bankruptcy Procedure 7052.

## BACKGROUND

**A.    The Hazeldell Project**

The relevant facts are as follows.[2]  On November 17, 2004, Ciappa entered into a contract with Innovative Property Resources, LLC ("IPR") to renovate the residential property known as 935 E. Hazeldell Drive in Wilmington, Delaware ("Hazeldell"). At the time the contract was executed, the Quinns controlled IPR: specifically, Jonathan and Christina Quinn each owned thirty-three percent interest, and Connie and Lewis Quinn Jr., Christina Quinn's parents, each owned sixteen and a half percent interest. (See Ciappa's Tr. Ex. A).  Following correspondence with officials from New Castle County, Delaware as to the condition of Hazeldell, Ciappa and IPR amended the contract to provide for the razing of the existing house and the construction of a new house. (See Ciappa's Tr. Ex. B).

The contract specified that Ciappa was to advance all costs associated with the demolition and construction.  To complete the project, Ciappa incurred substantial costs which required it to

---

[2]     The facts set forth herein are derived from the testimony of the witnesses at trial and the documents submitted into evidence in connection therewith.  (See Trial Tr., June 23, 2009 and August 25, 2009).  All documents offered by Ciappa and the Quinns were admitted into evidence with the exception of the Quinns' offered note from a doctor.  Ciappa objects to this document on the basis that it has not been afforded the opportunity to cross-examine the doctor despite requesting it be allowed to do so.  At trial, the Court declined to rule immediately as to the doctor's note.  The Court will address the admissibility of this document later in this Opinion.

2

borrow $61,000 from investors and take out a $45,000 equity line on Michael Ciappa's personal property.  Upon the sale of Hazeldell, Ciappa and IPR were to split the remaining profit equally after deducting the demolition and construction costs and IPR's initial purchase price of Hazeldell.  If Hazeldell was not sold, the contract stipulated that a mortgage loan would be taken out to compensate Ciappa and IPR.  (See id.).

Following construction of the new house, IPR marketed Hazeldell.  On April 20, 2005, IPR contracted to sell Hazeldell to Yolanda Smith ("Smith") for $195,000.  Settlement was scheduled for June 20, 2005.  During the period between the execution of the contract with Smith and the scheduled settlement date, Ciappa contacted IPR and the Quinns repeatedly for information as to the progress of the sale, but received no updates.  Ultimately, Smith withdrew from the contract to purchase Hazeldell.  It is undisputed that the only reason Smith refused to go to settlement was because IPR did not agree with the amount of Ciappa's claimed construction costs ($103,917.71).  If Smith had purchased Hazeldell as contemplated, that purchase would have generated sufficient funds to reimburse Ciappa for all its construction costs, to reimburse IPR for its initial purchase price of Hazeldell, and for both IPR and Ciappa each to make a profit of $20,541.41.  (See Joint Tr. Ex. 1).

After the sale fell through, pursuant to a deed prepared on

3

July 3, 2005 and recorded on August 3, 2005, the Quinns caused
IPR to transfer Hazeldell from IPR to Jonathan and Christina
Quinn for a purchase price of $10.  The Quinns thereupon took up
residence in Hazaldell.

In executing the transfer of Hazeldell, the Quinns did not
obtain the approval of Connie and Lewis Quinn Jr., the two other
owners of Hazeldell by way of their percentage ownership in IPR.
Further, in transferring Hazeldell to themselves, the Quinns
represented to the State of Delaware Division of Revenue that
they owned IPR in its entirety and thereby claimed a tax
exemption allowing the transfer of Hazeldell from a wholly-owned
entity to the owners of that entity.  If the Quinns had not
claimed that exemption, they would have owed the State of
Delaware $5,850 in transfer taxes.  (See Ciappa's Tr. Ex. C).

The Quinns applied for and received a $155,500 credit line
using Hazeldell as collateral.[3]  (See Ciappa's Tr. Ex. D).
Instead of reimbursing Ciappa for its razing and construction
costs and paying IPR the initial purchase price of Hazeldell as
the construction contract required, the Quinns used the funds to
speculate on properties sold at sheriff's sales.  In particular,
Jonathan Quinn used $80,000 of the credit line to buy a bank's

---

[3]    Specifically, Jonathan Quinn applied for the credit
line.  Christina Quinn was not listed on the application as co-
owner of Hazeldell, nor did she sign the application.

right in a loan, which, upon sheriff's sale for $160,000, created an $80,000 profit.

**B.    <u>The Superior Court Litigation</u>**

Ciappa filed a mechanic's lien against Hazeldell and initiated an *in personam* action in the Superior Court of the State of Delaware against IPR and the Quinns seeking reimbursement for its costs.  In a cogent written opinion,[4] the Superior Court held that: (1) Ciappa "properly performed [and completed] the construction work" on Hazeldell pursuant to the construction contract, including "routinely and consistently" updating IPR as to its progress and construction costs; (2) "the sale of Hazeldell to Smith failed to occur through no fault of Ciappa"; (3) the Quinns refused to advise Ciappa as to the progression of the sale of Hazeldell to Smith; and (4) the Quinns and IPR "had no justifiable reason to thwart the sale of Hazeldell in June 2005," and, thus, breached the contract.  The Superior Court awarded Ciappa a mechanic's lien against Hazeldell and *in personam* judgments against the Quinns in the amount of $103,917.71, plus interest from June 30, 2005, and net profit from the lost sale of Hazeldell of $20,541.41.  <u>Ciappa Constr., Inc. v. Innovative Prop. Res., LLC</u>, 2006 Del. Super. LEXIS 415 (Del. Super. Ct. Oct. 19, 2006).

---

[4]    The Superior Court decided the matter on October 19, 2006 following a bench trial, and issued an amended written opinion on December 18, 2006.

5

Based upon the Quinns' behavior in connection with Hazeldell and in connection with Ciappa's action to recover its construction costs, in a subsequent decision dated March 2, 2007, the Superior Court awarded Ciappa its attorneys' fees. <u>Ciappa Constr., Inc. v. Innovative Prop. Res., LLC</u>, 2007 Del. Super. LEXIS 86 (Del. Super. Ct. Mar. 2, 2007). The Superior Court later set the recoverable fees at $45,407.92 plus expert costs of $3,387.90 and court costs of $610. <u>Ciappa Constr., Inc. v. Innovative Prop. Res., LLC</u>, 2007 Del. Super. LEXIS 157 (Del. Super. Ct. June 12, 2007). In total, the Quinns owe Ciappa $206,789.72, including interest. The Quinns did not appeal these judgments, thereby making them final.

C.   **The Bankruptcy Proceedings**

In anticipation of a sheriff's sale of Hazeldell noticed for September 11, 2007, the Quinns filed a Chapter 13 petition on September 7, 2009 [Docket No 1]. Despite the finality of the judgments described above, the Quinns scheduled Ciappa's claim as contingent, unliquidated, unsecured, and disputed. In addition to Ciappa's claim, the Quinns listed a secured claim for a car loan in the amount of $2,592.50, another secured claim for a different car loan in the amount of $3,280, student loans in the amount of $14,616.24, an unsecured line of credit in the amount of $36,880.01, and other unsecured claims owing to seven different individuals and entities in a total amount of

6

$31,456.69.  They also listed Hazeldell as real property worth $193,500 with a secured first mortgage claim against it in the amount of $48,252.77 and a secured home equity line claim against it –- the line of credit received from USAA -- in the amount of $152,487.29.

Along with their petition, the Quinns submitted individual federal tax returns for the previous two years (2005 and 2006) and partnership income tax returns for IPR for the previous two years (2005 and 2006).  An examination of these tax returns reveals that, on IPR's 2005 tax return, Jonathan and Christina Quinn are listed as each owning forty-five percent interest in IPR, and that, on IPR's 2006 tax return, Jonathan and Christina Quinn are listed as each owing fifty percent interest in IPR. (See Ciappa's Tr. Exs. E and G).  No agreements between the Quinns and the other two interest holders of IPR –- Connie and Lewis Quinn Jr. –- were executed to alter the original ownership percentages in IPR.  By claiming that they collectively owned ninety and, then, one hundred percent of IPR, the Quinns were able to depreciate the property held by IPR on their federal and state individual tax returns, which decreased the amount they owed the Internal Revenue Service and the State of Delaware Division of Revenue.

Further, on their 2005 and 2006 individual federal income tax returns, the Quinns listed income from IPR during both years.

(See Ciappa's Tr. Exs. F and H).  In contrast, on their Statement of Financial Affairs submitted in conjunction with their Chapter 13 petition, the Quinns represented that they received no income from IPR or any other source in 2006.  Similarly, on their Statement of Financial Affairs [Docket No. 21], the Quinns represented that they transferred no property, other than in the ordinary course, during the two years prior to their petition date.  However, during that period, the Quinns used the credit line they received from USAA to speculate on other real estate deals.

On October 15, 2007, subsequent to filing a timely secured proof of claim based on the Superior Court judgments, Ciappa filed an objection to the plan [Docket No 26]: Ciappa contested the characterization of the mechanic's lien as contingent, unliquidated, unsecured, and disputed, and, based on the discrepancies noted above, asserted that the Quinns' filing was not in good faith.  The Quinns' plan was subsequently amended [Docket No. 41] to provide for the "surrender of the real property [Hazeldell] in full satisfaction of the debt" to the first mortgage holder and home equity line holder noted above. The amended plan referred to Ciappa's mechanic's lien as "other secured debt" to be treated as follows: "The mechanic's lien by Ciappa Construction shall ride with the property and as such be

8

extinguished on sale.  No payment shall be paid directly or as secured."

Subsequently, on January 22, 2009, Ciappa filed an objection to the amended plan [Docket No. 53] which reiterated its contention that the Quinns' filing and initial plan were made in bad faith and which asserted that the Quinns' amended plan also was made in bad faith.  In its objection, Ciappa specifically noted that the Quinns proposed extinguishment of the mechanic's lien upon the sale of Hazeldell and sought a discharge of personal liability, thereby inappropriately intending to prevent the payment of any unsecured deficiency claim to Ciappa that might accrue upon the sale of Hazeldell.

On November 21, 2007, Ciappa filed a motion for relief from the automatic stay for lack of adequate protection [Docket No. 36], which was granted by default on December 17, 2007 [Docket No. 49].  On February 12, 2008, Hazeldell was sold at a sheriff's sale.  Ciappa purchased Hazeldell at that sale for $80,000.

Upon entering Hazeldell after the sheriff's sale and after the Quinns had vacated the premises, Ciappa found that the Quinns had thoroughly trashed Hazeldell.  The Quinns had removed closet organizers previously installed into the interior of the closets, thereby leaving large holes in the walls inside the closets, had removed the closet doors from their tracks and piled them in the corners of rooms, had damaged light fixtures, and had removed and

damaged portions of the kitchen stove, among other things.  In
addition, while they were moving out of Hazeldell, the Quinns
locked three large adult dogs[5], each over a hundred pounds, and
thirteen large mastiff puppies, each at least fifty pounds, in
the basement of Hazeldell.  Jonathan Quinn testified that he
confined the dogs to the basement for one day and one night while
he removed and relocated fencing from Hazeldell to the Quinns'
new residence, and that the Quinns checked in on the dogs
periodically during that time.  It is highly questionable whether
the dogs were left unattended for the short time-frames that
Jonathan Quinn's testimony implies:  in that time, the dogs
chewed through the basement door, destroying the door and
escaping into the main floor of Hazeldell.  Once they escaped
into the main floor, the dogs urinated and defecated repeatedly
in multiple rooms, including on carpeted areas.  The excrement
was sitting on the floors and carpets of Hazeldell long enough
for the dogs to smear or otherwise relocate it to the walls, as
high as four feet up the wall in some places[6].  Similarly, the
dogs urinated and defecated in multiple areas in the basement.
(See Ciappa's Tr. Ex. I).  To repair the extensive damage to

---

[5]     Two mastiffs and a great dane.

[6]     The Court was provided at trial with a surfeit of high
resolution photographic evidence.

Hazeldell, Ciappa spent $13,829.29, including materials and 160 hours of labor.  (See Ciappa's Tr. Ex. J).

After the sheriff's sale and upon finding Hazeldell in such a damaged condition, Ciappa filed a motion for leave to amend its claim to include an unsecured claim for the deficiency balance that resulted from the sheriff's sale.  Ciappa requests an unsecured claim of $151,247.17, which it calculates by subtracting from its initial secured claim of $206,789.72 the $80,000 purchase price of Hazeldell at the sheriff's sale, adding the $6,713.76 it paid in transfer tax pursuant to that purchase, adding the $3,914.40 it paid to the sheriff in purchase costs, and adding the $13,829.29 it spent to rehabilitate Hazeldell after the purchase.[7]

**D.   The Quinns' Accident and the Amended Plan**

In early September 2008, the Quinns were involved in a serious motor vehicle accident that resulted in Jonathan Quinn becoming fully incapacitated and being unable to work at all.  As a result of the accident, Christina Quinn testified that she

---

[7]   These figures are the figures Ciappa presented orally at trial.  In its papers [Docket No. 63, p. 6], Ciappa asks for a deficiency judgment of approximately $89,000, which it calculates as the amount of its secured claim (approximately $270,000), less $122,000 net value of Hazeldell ($180,000 less $48,000, the approximate payoff on the first mortgage encumbering Hazeldell), less approximately $10,000 in repair and replacement costs due to the state in which Hazeldell was left after the sheriff's sale, and less an additional $4,000 in interest that accrued on its secured claim prior to the sheriff's sale.

reduced her employment schedule to part-time in order to take care of Jonathan Quinn.  Recently, Christina Quinn returned to work full-time, but Jonathan Quinn remains unable to work at all. Jonathan Quinn testified that he needs to undergo back surgery in the near future to repair damage to his spine from the accident and, thus, that he will continue to remain incapacitated for the foreseeable future, including through the duration of the Quinns' Chapter 13 plan.

Prior to the accident, the Quinns' Chapter 13 plan provided for a monthly payment of $1,000, which yielded unsecured creditors a 49% distribution.  Despite the accident, the Quinns paid the $1,000 monthly payments through November 2008.  However, in reaction to a drain on funds, coupled with the rising costs of Jonathan Quinn's medications and care, on December 5, 2008, the Quinns filed a motion to modify their plan [Docket No. 97] to provide for a monthly payment of $66 for the remaining 52 months beginning December 2008.  A $66 monthly trustee payment would yield unsecured creditors a 0% distribution.  Even with Christina Quinn's return to full-time employment, the Quinns represent that this is their best effort.

Ciappa objects to the Quinns' motion to modify their plan [Docket No. 107], specifically noting that the Quinns have retained special counsel for the purpose of seeking recovery of a personal injury claim as to the motor vehicle accident.  Ciappa

contends that any potential recovery is either unknown or undisclosed, and Ciappa submits it would be inequitable to modify the Quinns' plan while their estate remains unliquidated.  Ciappa also complains that the Quinns have not made available Jonathan Quinn's doctor to confirm Jonathan Quinn's physical condition. As outlined in footnote 2 <u>supra</u>, the Quinns submitted a doctor's note as to Jonathan Quinn's condition, but Ciappa was not afforded an opportunity to depose or cross-examine the doctor.

Following trial, the following motions and issues remain for disposition: (1) Ciappa's motion for dismissal of the Quinns' Chapter 13 proceeding [Docket No. 74]; (2) Ciappa's motion for leave to amend its claim [Docket No. 63]; (3) the Quinns' motion to modify their plan [Docket No. 97]; and (4) the admission of the Quinns' offered doctor's note into evidence.

**<u>JURISDICTION AND VENUE</u>**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (L) and (O).

**<u>DISCUSSION</u>**

<u>Bad Faith Dismissal</u>

Pursuant to 11 U.S.C. § 1307(c), a court may dismiss a bankruptcy filing made in bad faith "for cause."  <u>See</u>  <u>In re</u>

Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (noting that § 1307(c)

does not explicitly mention a good faith requirement, but

nevertheless holding that a filing may be dismissed for bad

faith).  The Third Circuit recently restated the standard for

dismissal of a Chapter 13 petition:

> The Bankruptcy Court looks to the totality of the
> circumstances to determine bad faith, and may consider
> a wide range of factors, including, "the nature of the
> debt . . .; the timing of the petition; how the debt
> arose; the debtor's motive in filing the petition; how
> the debtor's actions affected creditors; the debtor's
> treatment of creditors both before and after the
> petition was filed; and whether the debtor has been
> forthcoming with the bankruptcy court and the
> creditors."

In re Myers, 491 F.3d 120, 125 (3d Cir. 2007) (quoting In re

Lilley, 91 F.3d at 496); see also In re Pierson, 2009 U.S. Dist.

LEXIS 43293, at *6 (E.D. Pa. May 20, 2009) ("A Bankruptcy Court

has considerable discretion in determining whether 'cause' exists

and whether dismissal is the appropriate remedy.").  In addition,

the Bankruptcy Abuse Prevention and Consumer Protection Act of

2005 requires that a bankruptcy plan be proposed in good faith.

11 U.S.C. § 1325(a)(3).

Once bad faith is raised by a creditor, the debtor bears the

burden of proving that its filings were in good faith.  See

Tamecki v. Frank (In re Tamecki), 229 F.3d 205, 207 (3d Cir.

2000) (noting, in the context of a Chapter 7 petition alleged to

have been filed in bad faith, that "once a party calls into

question a petitioner's good faith, the burden shifts to the

14

petitioner to prove his good faith").  Of particular importance
to the instant motion, the District of Delaware has held that
"unmistakable manifestations of bad faith need not be based upon
a finding of actual fraud, requiring proof of malice, scienter or
an intent to defraud."  Dye v. Joseph (In re Dye), 346 B.R. 669,
671 (D. Del. 2006) (quoting In re Waldron, 785 F.2d 936, 941
(11th Cir. 1986)).  Generally, in determining whether to dismiss
a Chapter 13 proceeding based on bad faith, a bankruptcy court's
inquiry into the circumstances of a Chapter 13 petition is
"inseparable from the bankruptcy courts' broad power to decide
whether the petitioner has abused the provisions, purpose, or
spirit of bankruptcy law."  In re Myers, 491 F.3d at 126 (quoting
In re Tamecki, 229 F.3d at 207) (internal quotations omitted).

Without doubt, the Quinns have behaved atrociously in the
years preceding and following their filing for bankruptcy,
especially with respect to Ciappa.  Further, based on the
evidence presented, it is clear that the Quinns deliberately
damaged Hazeldell after the sheriff's sale:  they imprisoned
sixteen dogs in a relatively small area for a long enough period
of time that the animals chewed through a door in order to break
free and wreck the home.

Nevertheless, in determining whether a bankruptcy filing
should be dismissed for bad faith, a court's inquiry must be
directed to the debtors' behavior toward all creditors and to the

15

debtors' overarching motives in filing for bankruptcy. See Myers, 491 F.3d at 125-26. Though much of the evidence and testimony presented at trial focused on the Quinns' interactions with Ciappa, this Court's consideration extends beyond that lengthy and obviously bitter dispute between the Quinns and Ciappa and must take into account the numerous other parties that have an interest in the Quinns' bankruptcy proceeding. When the universe of affected parties is considered and the Quinns' need for the protection of bankruptcy is recognized, it is clear that despite the Quinns' offensive interactions with Ciappa, the Quinns have met their burden of proof to demonstrate that they did not file for bankruptcy in bad faith, and that, overall, they have not acted with bad faith as to their bankruptcy proceeding.

Importantly, Ciappa is one of at least twelve other secured or unsecured creditors. The other secured and unsecured creditors in this case are typical of the creditors listed on most bankruptcy petitions: credit card balances, motor vehicle loans, home mortgages, and student borrowing. Similarly, though Ciappa holds a sizable claim, other secured and unsecured creditors hold a majority of total claims in dollar amount. No evidence was presented that these other claims arose because of the Quinns' bad faith. Notwithstanding their sordid dealings with Ciappa, the record reflects that the Quinns legitimately needed the protection afforded by bankruptcy when they filed.

The existence of multiple other creditors and the total dollar amount of those creditors' claims removes much of the suspicion as to the timing and purpose of the Quinns' petition.  Hazeldell was about to be sold at a sheriff's sale:  filing for bankruptcy represented a logical course of action for the Quinns at that juncture.

Also, though the Quinns may have made misstatements to the Court in various filed papers, they took appropriate steps within a reasonable amount of time to rectify those errors by filing updated schedules and amended plans.  The record reflects that the Quinns had misled or made misrepresentations to the Internal Revenue Service, the State of Delaware Division of Revenue, and Connie and Lewis Quinn Jr.  However, these individuals and entities have resolved their disputes with the Quinns and are not contesting the Quinns' Chapter 13 plan.  Indeed, only Ciappa continues to object to the Quinns' Chapter 13 proceeding.

The Quinns initiated their Chapter 13 proceeding in September 2007 and made pre-confirmation payments according to the plan for more than a year, including three months during which the Quinns had very little income due to the motor vehicle accident.  The Quinns testified that they gave up one of their cars and otherwise attempted to reduce their monthly expenses in order to repay their creditors as best they could.

Overall, the totality of the circumstances does not point toward bad faith in the commencement of these Chapter 13 proceedings.  As to a majority of the Quinns' debt, no evidence of bad faith was presented both in its nature and how it arose; as to the timing of the petition and motive in filing it, both are logical; as to how the Quinns treated creditors, and how that treatment affected their creditors, only Ciappa has a legitimate claim to grave mistreatment; and as to the Quinns' interactions with this Court and creditors other than Ciappa, the Quinns certainly could have acted better, but their conduct during these proceedings does not warrant a dismissal of the case.  Thus, the Quinns' Chapter 13 bankruptcy proceeding will not be dismissed based on grounds of bad faith.

D.   **Amending Ciappa's Claim**

A party that wishes to amend its claim after the bar date has passed must obtain permission of the bankruptcy court.  Fed. R. Civ. P. 15(a); Fed. R. Bankr. P. 7015.  An allowed amendment will relate back to the date the original claim was filed if the amendment "arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading."  Fed. R. Civ. P. 15(c)(2).  It is within the sound discretion of the court as to whether to allow an amendment.  See Interface Group-Nevada v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 141 (3d Cir. 1998); In re

18

Orion Ref. Corp., 317 B.R. 660, 664 (Bankr. D. Del. 2004) (noting two rationales for allowing amendments: "(1) bankruptcy courts are courts of equity and (2) amendment of a claim is likened to an amendment of a pleading").  In general, the Third Circuit follows a policy of liberality in allowing amendments, especially when a debtor had notice of the substance of a creditor's claim. In re Trans World Airlines, 145 F.3d at 140-41.

Amendment often is permitted "when the original claim provides notice of the existence, nature, and amount of the claim" or "to cure obvious defects, describe the claim with greater specificity or plead a new theory of recovery on facts of the original proof of claim."  In re Orion, 317 B.R. at 664 (noting further that "[p]ost-bar date amendment should be scrutinized to ensure that the amendment is not a new claim"); see also In re Brooks, 2008 Bankr. LEXIS 621, at *10-13 (Bankr. E.D. Pa. Feb. 13, 2008) (allowing the amendment of a claim to correct a "facial error" and specifically noting that the debtor knew of this claim and that its amendment would not "harm" the debtor or otherwise alter the debtor's "condition in any way"). Courts also consider whether permitting the amendment "involves an irrevocable change in position or some other detrimental reliance on the status quo."  In re Brooks, 2008 Bankr. LEXIS at *12-13 (quoting In re Dietz, 136 B.R. 459, 468-69 (Bankr. E.D. Mich. 1992)).  As such, if the party requesting amendment unduly

19

delays in seeking that amendment, a court may deem such delay
preclusive.  See Midland Cogeneration Venture L.P. v. Enron Corp.
(In re Enron Corp.), 419 F.3d 115, 133 (2d Cir. 2005) ("Multiple
factors play a role in this analysis [of whether to allow an
amendment], including . . . whether . . . the delay was
justified."); In re Dubeck, 74 A.F.T.R.2d (RIA) 5306, at *12
(Bankr. D. N.J. 1994) ("Bankruptcy courts are not required to
permit late amendments which are primarily used as a back-door
route to secure bar-date extensions").

        In a situation in which collateral underlying a secured
claim is surrendered, as here, the burden is on the creditor who
has timely filed a proof of claim to seek to amend its claim to
assert an unsecured claim.  See, e.g., In re Harrison, 987 F.2d
677, 680-81 (10th Cir. 1993).  As to the instant motion, Ciappa
timely filed a secured proof of claim[8] and timely objected to the

_____

        [8] At trial, the Quinns argued that Ciappa initially should
have filed two proofs of claim: one secured proof of claim based
on the mechanic's lien and one unsecured proof of claim based on
the *in personam* judgments.  As such, the Quinns contend that
Ciappa should be precluded from asserting an unsecured claim as
it missed its initial chance.  As argued in turn by Ciappa, if
Ciappa had filed both proofs of claim, the Quinns likely would
have argued that they were duplicative.  The Court will not
penalize Ciappa for initially filing only one proof of claim.
Indeed, I agree with Ciappa that the Quinns probably would have
objected to the same claim being asserted twice.  The overarching
aim of allowing amendment is to correct such errors in filed
proofs of claim.  Moreover, as discussed further, pursuant to 11
U.S.C. § 506(a), Ciappa's secured claim based on the mechanic's
lien carries with it an assertable unsecured claim for the under-
secured amount of the total claim.  Regardless of whether Ciappa
initially filed two proofs of claim, the Quinns were on notice

classification of that claim as contingent, unliquidated, unsecured, and disputed.  Likewise, when the Quinns amended their plan to propose to surrender Hazeldell in full satisfaction of Ciappa's claim, Ciappa again filed an objection, clearly seeking to preserve its full claim.  Now that the collateral underlying Ciappa's claim has been sold at a sheriff's sale, Ciappa seeks to amend its claim to an unsecured claim for the deficiency judgment and for the damage that the Quinns did to Hazeldell after the sheriff's sale.

Based on this history, the Quinns undeniably were on notice of Ciappa's claims.  Also, as Ciappa's claim took the form of a mechanic's lien and *in person* judgments, the Quinns should have known that Ciappa could (as it later did) assert both a secured and an unsecured claim.  See 11 U.S.C. § 506(a) (providing that a claim is secured only up to the value of the collateral securing it and that any debt in excess of that amount is an unsecured claim).  Moreover, 25 Del. C. § 2728 specifically provides that when the amount received from a liquidation or sale of the property on which a mechanic's lien is attached is insufficient to satisfy the lien, the remainder is a deficiency claim pursuable by the holder of the lien.  The Quinns should have foreseen that Ciappa likely would be entitled to assert an unsecured claim on multiple bases.

---

that Ciappa likely was entitled to an unsecured claim.

21

In addition, allowing Ciappa to amend its claim will not unduly burden or harm any other creditors: Ciappa is asserting a claim that it is entitled to by law, which it has asserted repeatedly since the beginning of the Quinns' Chapter 13 proceeding in a form accessible to other creditors (namely, objections), and which does not place it ahead of any other creditor. Ciappa's request for leave to amend is best described as a request to cure an obvious defect of its claim and to describe its claim with greater specificity. Thus, I will grant Ciappa leave to amend its claim.

As to the appropriate amount of the amended claim, Ciappa is entitled to a deficiency judgment calculated by subtracting the total amount of its claim from what it recovered pursuant to the sheriff's sale that proceeded after this Court lifted the automatic stay. Hazeldell was sold at a sheriff's sale for $80,000. Pursuant to the sale, Ciappa incurred a total of $10,628.16 in related costs. Thus, Ciappa effectively recovered $69,371.84, and, therefore, provisionally, Ciappa's unsecured claim is $137,417.88 ($206,789.72 minus $69,371.84).

Ciappa also requests that the unsecured claim include an additional $13,829.29, comprising its costs to rehabilitate Hazeldell after the Quinns' damaged the property following the sheriff's sale. In response, the Quinns assert that property is bought as-is at a sheriff's sale. See 10 Del. C. § 4976 ("Upon

confirmation by the court of any sale of lands and tenements, made by virtue of execution process, the sheriff, or officer making the sale, shall execute, acknowledge and deliver to the purchaser a good and sufficient deed for the premises so sold."). I find that Ciappa is entitled to the rehabilitation expenses.

When Ciappa purchased Hazeldell at the sheriff's sale, it purchased Hazeldell in the condition that it was in at that time, not subsequent to the Quinns extensively damaging it. It is axiomatic that a buyer at a sheriff's sale takes the property in the condition in which it is left. However, Jonathan Quinn testified that much of the damage he and Christina Quinn did to Hazeldell occurred immediately after the sheriff's sale. Specifically, the damage that was most expensive, degrading, and time-consuming to clean up was caused by the Quinns' imprisoning sixteen dogs in a relatively small basement immediately before the Quinns vacated Hazeldell. The Quinns therefore cannot hide behind the fact that purchasers at a sheriff's sale take property "as-is" to escape the consequences of their actions. Ciappa has provided adequate documentation of the expenses, against which the Quinns presented no evidence, and the expenses are legitimate: Ciappa may add the $13,829.29 in rehabilitation costs to its unsecured claim. Accordingly, Ciappa is granted leave to amend its claim to assert an unsecured claim in the amount of $151,247.17.

**E.    <u>Modifying The Quinns' Plan</u>**

As a result of a loss of income due to their motor vehicle accident, the Quinns seek modification of their Chapter 13 plan. 11 U.S.C. § 1329(a) provides that: "At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor . . . to -- (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan."  11 U.S.C. § 1329(b) further provides that "Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a), [which incorporates § 1325(b),] of this title apply to any modification under subsection (a) of this section." Pursuant to 11 U.S.C. § 1325(b)(1)(B), if a Chapter 13 plan will not result in full payment to all creditors and an unsecured creditor objects, "a debtor must devote all projected disposable income for the ensuing . . . years to the plan."  <u>Turek v. DeHart (In re Turek)</u>, 346 B.R. 350, 354 (Bankr. M.D. Pa. 2006).  Thus, this ability-to-pay standard continues through modification of a Chapter 13 plan: debtors are required to commit all their projected disposable income to a plan for the duration of the plan.  <u>See</u> <u>In re Weaver</u>, 2006 U.S. Dist. LEXIS 4758, at *7 (E.D. Pa. Feb. 7, 2006) (citing <u>In re Norris</u>, 165 B.R. 515, 517 (Bankr. M.D. Fl. 1994)).

I find that the Quinns' modified plan meets the requirements of Chapter 13.  The Quinns have demonstrated that they have suffered a severe loss of income that renders payment pursuant to their current plan infeasible.[9]  The Quinns further testified that their modified plan represents their best effort, providing for the utilization of all their disposable income.  Thus, I find that the Quinns' modified plan is proposed in good faith, and that the other requirements of § 1325 -- of relevance, that unsecured creditors will receive as much as they would if the Quinns' estate was liquidated under Chapter 7 and that the Quinns will be able to comply with the modified plan -- also are met.

Further, Ciappa objects to the Quinns' motion to modify their plan principally because the Quinns may receive a settlement as a result of their currently pending personal injury claim.  In the event that the Quinns do receive such a settlement or judgment large enough to provide additional disposable income

---

[9] As noted in the background section of this Opinion, in addition to their testimony about the effects of the motor vehicle accident on their ability to continue to generate the amount of disposable income on which their current Chapter 13 plan is based, the Quinns offered a note from Jonathan Quinn's doctor detailing the extent of his injuries and resulting physical and work capabilities.  I find that the combination of Christina Quinn's and Jonathan Quinn's testimony is sufficient to establish the existence and extent of Jonathan Quinn's resulting condition and how that condition continues to impact the Quinns' ability to generate disposable income for their Chapter 13 plan. As Ciappa was not afforded an opportunity to cross-examine the doctor, I will sustain Ciappa's objection to the admission of the doctor's note.

the Quinns should, and the Court herein orders them to, apprise
the Chapter 13 Trustee and this Court of that judgment or
settlement.  See 11 U.S.C. § 1306(a) (providing that property of
the estate includes "all property of the kind specified in [§
541] that the debtor acquires after the commencement of the case
but before the case is closed, . . .").  At that juncture, the
Court and the Chapter 13 Trustee can take up modifying the
Quinns' plan further or otherwise equitably distributing the
money.  See 11 U.S.C. § 350(b) ("A case may be reopened in the
court in which such case was closed to administer assets, to
accord relief to the debtor, or for other cause.").

Similarly, pursuant to 11 U.S.C. § 521, the Quinns are
obligated to file with the Court tax returns which will serve to
evidence any changes in their disposable income.  If, at any
time, the Quinns' disposable income increases, their plan should
be modified again to provide some return to unsecured creditors.
At this time, I will confirm the Quinns' modified Chapter 13
plan.

### CONCLUSION

For the foregoing reasons, the Court finds that the Quinns'
Chapter 13 bankruptcy filings were not made in bad faith, that
Ciappa should be permitted to amend its claim, and that the
Quinns' modified plan meets the applicable requirements of the
Bankruptcy Code.  Accordingly, the Court will deny Ciappa's

motion to dismiss the Quinns' Chapter 13 proceeding, will grant Ciappa leave to amend its claim, and will confirm the Quinns' modified Chapter 13 bankruptcy plan.

An appropriate order follows.


By the Court,


Dated: December 29, 2009          _____
                                  Brendan Linehan Shannon
                                  United States Bankruptcy Judge